329 So.2d 287 (1976)
Willie Jasper DARDEN, Appellant,
v.
STATE of Florida, Appellee.
Nos. 45056, 45108.
Supreme Court of Florida.
February 18, 1976.
Rehearing Denied April 19, 1976.
*288 James A. Gardner, Public Defender, and Harold H. Moore, Asst. Public Defender, Sarasota, for appellant.
Robert L. Shevin, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., for appellee.
BOYD, Justice.
Pursuant to Article V, Section 3(b)(1), Florida Constitution, this Court takes jurisdiction over a direct appeal from a final judgment imposing the death penalty.
Carl's Furniture Store in Lakeland, Florida was robbed on September 8, 1973. During the course of the robbery, the proprietor, Carl Turman, was shot and killed and a neighbor boy, Phillip Arnold, was wounded. Soon afterwards, the Appellant, Willie J. Darden, who was on furlough from the Division of Corrections, lost control of the borrowed automobile he was driving and smashed into a telephone pole some three miles from the site of the murder, assault and robbery. After returning to his girl friend's house in Tampa that night, the Appellant was arrested on a traffic charge, leaving the scene of an accident. Soon thereafter, he was arrested and charged with murder, assault with intent to commit murder, armed robbery, and assault with intent to commit rape. The grand jury returned indictments charging first degree murder, robbery, and assault with intent to commit murder in the first degree.
Both before and during trial, Mr. Darden was identified as the guilty party by Phillip Arnold and by Mrs. Helen Turman, the decedent's wife, who was present and assaulted during the commission of the robbery and murder. The trial jury found the defendant guilty of murder in the first degree, assault with intent to commit murder in the first degree, and robbery. After the second phase of the bifurcated trial mandated by Florida Statutes Section 921.141, the jury recommended the imposition of the death penalty. After enumerating its findings of aggravating and mitigating circumstances as required by Section 921.141, the trial court sentenced the Appellant to death by electrocution.
Appellant alleges eight grounds for reversal. The racial composition of the venire, the exclusion of prospective jurors because of their expressed attitudes toward the death penalty, and the alleged unconstitutionality of the sentencing provisions of Florida Statutes Section 921.141 provide three of these grounds. Another is the court's eliciting from a state witness a comment regarding other murder cases in which Darden was, at least initially, a suspect. The courtroom identifications of the defendant by Mrs. Turman and Phillip Arnold respectively, are alleged to be tainted by impermissibly suggestive pre-trial procedures and provide two more allegations of reversible error. A further ground is the allegedly erroneous admission into evidence of a gun asserted to have been used in the holdup and murder. Appellant's final point on appeal is that certain remarks made by assistant state attorneys during closing arguments were so prejudicial to Appellant's *289 cause as to require the granting of a new trial.
We have reviewed all the points raised on appeal by the Appellant and conclude that only one merits consideration for reversal of the conviction below, i.e., whether statements made by the assistant state attorneys in closing argument were so inflammatory and abusive as to have deprived the Appellant of a fair trial. The law requires a new trial only in those cases in which it is reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done or in which the comment is unfair.
It should be noted that the first denunciation of the criminal who committed the acts was by Appellant's own attorney, who made the following statement to the jury:
"I intend to just briefly summarize the evidence that has been before you. I'm going to attempt to be as objective as possible. The first witness that you saw was Mrs. Turman, who was a pathetic figure; who worked and struggled all of her life to build what little she had, the little furniture store; and a woman who was robbed, sexually assaulted, and then had her husband slaughtered before her eyes, by what would have to be a vicious animal." (emphasis supplied)
The defense counsel was saying only that the person who committed the crimes was an animal, and he would have had the jury find that someone other than Appellant was the perpetrator of the criminal acts. Although Appellant further complains of the expression of his personal views by the Assistant State Attorney about Appellant, the defense counsel made the following statement which showed his personal reaction:
"But can you get the pistol back to Mr. Turman? Can you get the pistol back to Mr. Darden? No, we can't do that, but we got the pistol, and it's good enough for us. It's not good enough for me. I wouldn't do what you're being asked to do on that, really, I wouldn't... ." (emphasis supplied)
The record shows the following remarks were made in the State Attorney's portion of the closing arguments:
"... As far as I am concerned, and as [defense counsel] said as he identified this man, this person as an animal, this animal was on the public for one reason ... (emphasis supplied)
* * * * * *
"... I am sure that I want you to remember [defense counsel's] opening statement, opening argument when he called this person an animal. Remember that, because I will guarantee you I will ask for the death. There is no question about it. (emphasis supplied)
"The second part of the trial I will request that you impose the death penalty. I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it ... . (emphasis supplied)
* * * * * *
"I don't know, he said on final argument I wouldn't lie, as God is my witness, as God is my witness, I wouldn't lie. Well, let me tell you something: If I am ever over in that chair over there, facing life or death, life imprisonment or death, I guarantee you I will lie until by teeth fall out. (emphasis supplied)
"What does he have to lose to lie? Nothing. Nothing....
* * * * * *
"Mr. Turman, not knowing anything happened, not knowing what was going on. I wish he had had a shotgun in his hand when he walked in the back door and blown his face off. I wish that I could see him sitting here with no face, *290 blown away by a shotgun, but he didn't. He had no gun. He had no chance. He didn't give it to him. With a gun in the woman's back about to attempt his lust, his greed, the poor man opened the door and he shoots him between the eyes. Between the eyes, isn't that enough? Not for Darden it's not enough. There's more. (emphasis supplied)
* * * * * *
"... I wish someone had walked in the back door and blown his head off at that point." (emphasis supplied)
In light of the "animal" characterization by the defense, when the jury found Appellant guilty, the statements of prosecuting counsel that Appellant was an animal do not seem unduly inflammatory. It seems inappropriate to reverse the State's conviction because the prosecutor was making the same alleged errors as defense counsel.[1] A careful examination of the record leads this Court to conclude that, although the prosecutor's remarks under ordinary circumstances would constitute a violation of the Code of Professional Responsibility, in this particular case they amount to harmless error when the totality of the record is considered in these uniquely vicious crimes.
Let us briefly review the conduct condemned by the prosecutor. The Appellant was a career criminal who admitted at least five convictions and who was on a weekend furlough from the state prison to visit his family when these felonies were committed. His family, including his wife, was out of the State, so Appellant stayed with another woman in Tampa. On the day of the crimes he took the woman to work and then used her car to visit various bars where he drank alcohol and gambled in a pool hall contrary to standards imposed by the conditions of the furlough, even neglecting to pick up the woman when she left work.
Appellant said he was paid to drive an unidentified stranger named Roy to Lakeland, that he had car trouble, and that he was racing back to Tampa where he was supposed to be best man in a wedding. He admitted speeding in a rainstorm and creating great danger to other motorists when he wrecked the car on the same road taken by the killer according to witnesses. The wreck was near the murder scene and occurred about the same time as the crimes; furthermore, the car Appellant drove fit the description of the getaway vehicle used by the criminal after his crimes were committed. The pistol admitted into evidence was identified as probably being the death weapon and was of the same type; it was found the day after the killing, robbery and attempted murder only thirty-nine feet from where Appellant's car was wrecked. Four cartridges had been fired, the very same number fired at the scene of the crime.
The record shows that Appellant first robbed Mrs. Helen Turman and that, when her unarmed husband Carl started to enter the store, Appellant shot him between the eyes scattering blood and brains. As a sixteen year old boy, Phillip Arnold, tried to aid the wounded man, Appellant shot him in his mouth, neck, and side, leaving permanent injuries, including a bullet still in his neck at time of trial. While her bleeding husband lay in a rainstorm at the door, Appellant tried to force Mrs. Turman to commit an unnatural sex act upon him at gun point. She refused, and after shooting the boy Appellant left the area.
How is it possible to use language which is fair comment about these crimes without shocking the feelings of any normal person? The language used by the prosecutor would have possibly been reversible error if it had been used regarding a less heinous set of crimes. The law permits fair comment. This comment was fair.
When the work product of a criminal is a mortally wounded husband, a wife who is *291 sexually assaulted and robbed, and a sixteen year old boy who is shot three times while trying to help the wounded man, there is little basis to complain of the State Attorneys' expressions in reasonably describing what happened and what should be done to the guilty party.
There was overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges and a recommendation of a death sentence for first degree murder. There were absolutely no mitigating circumstances to reduce the penalty from death to life imprisonment.
While the rule against inflammatory and abusive argument by a state's attorney is clear, each case must be considered upon its own merits and within the circumstances pertaining when the questionable statements are made, and, if there is ample basis in the record to support the remarks, a conviction will be affirmed.[2] Our review of the record convinces us that the remarks complained of were not sufficient to deprive Appellant of a fair trial when the totality of the evidence is considered.[3]
Additionally, Appellant admits that his attorney voiced but a single objection to the prosecutor's closing arguments, that it was not directed to any of the allegedly inflammatory matter, and that his attorney waited until the fifth occasion to object at all. This Court has held that a prosecutor's challenged argument will be reviewed on appeal only when a timely objection is made.[4]
Accordingly, the judgments and sentences are affirmed.
It is so ordered.
ADKINS, C.J., ROBERTS and OVERTON, JJ., and FERRIS, Circuit Judge, concur.
SUNDBERG, J., dissents with an opinion, with which ENGLAND, J., concurs.
SUNDBERG, Justice (dissenting).
I dissent. Remarks made by the prosecutors during closing argument were so inflammatory and prejudicial that appellant should be afforded a new trial.
The fact that defense counsel characterized a person who would commit the offenses for which defendant was being tried as "an animal" did not excuse the prosecutor's subsequent, repeated personal descriptions of the defendant in this manner:
"... But let me tell you something. As far as I am concerned, there should be another Defendant in this courtroom, one more, and that is the division of corrections, the prisons. As far as I am concerned, and as Mr. Maloney said as he identified this man, this person as an animal, this animal was on the public for one reason. Because the division of corrections turned him loose, lets him out, lets him out on the public. Can we expect him to stay in a prison when they go there? Can't we expect them to stay locked up once they go there? Do we know that they're going to be out on the public with guns, drinking?
"Mr. Darden said, oh, I don't know, no, I can't know, it's all right to drink, it's all right to drink alcoholic beverages, except the last. Remember one comment he made? Unless, well, as long as they don't find out. Find out? He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash.
"This man admitted that he is a prisoner, that he had a gun in his possession. He doesn't work, he is in the pool halls, he is in the bars, he is in the lounges. He is a prisoner, supposed to have been. *292 He is not a prisoner. No, I wish that person or persons responsible for him being on the public was in the doorway instead of Mr. Turman. I pray that the person responsible for it would have been in that doorway and any other person responsible for it, I wish that he had been the one shot in the mouth. I wish that he had been the one shot in the neck, instead of the boy.
"Yes, there is another Defendant, but I regret that I know of no charges to place upon him, except the public condemnation of them, condemn them. Turn them loose to visit his family, to visit his family, that turns out his family is a girl friend in Tampa, his family is in, I think he called her his sponsor, his sponsor... ."
Perhaps the reference to a leash, although certainly inflammatory, was excusable as being evoked by two references in argument by appellant's counsel to the crimes being "the work of an animal"; however, I find no provocation by the defense for the balance of the prosecutor's above-quoted statements.
Another area of improper comment is exemplified by the following remarks:
"... The second part of the trial I will request that you impose the death penalty. I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it. It's the only way that anybody can be sure of it now, because the people that turned him loose  this man served his time and if this man served his time as the Court has sentenced him, that's fine. If he's rehabilitated, fine. But let him go home on furloughs, weekend passes  not home, strike that, excuse me  go over with his girl friend for the weekend, go shoot pool for the weekend, go sell his guns, or gun, for the weekend, go consume drink in the bars over the weekend... ."
The precise implication in this and the foregoing excerpt is that the parole authorities and the Division of Corrections are being "soft on criminals" and the jury should remedy such situation by finding the appellant guilty on the first degree murder charge. This inserts a wholly immaterial issue into the proceedings which the jury could try rather than the defendant who was on trial; however, the defendant had to be the recipient of any verdict brought back by the jury.
Nor could the remarks of defense counsel be construed to serve as an invitation for the prosecutor's inflammatory expressions of regret that appellant had not been killed during his alleged commission of the crimes:
"... Mr. Turman, not knowing anything happened, not knowing what was going on. I wish he had had a shotgun in his hand when he walked in the back door and blown his face off. I wish that I could see him sitting here with no face, blown away by a shotgun, but he didn't. He had no gun. He had no chance. He didn't give it to him. With a gun in the woman's back about to attempt his lust, his greed, the poor man opened the door and he shoots him between the eyes. Between the eyes, isn't that enough? Not for Darden it's not enough. There's more... ."
After describing further conduct surrounding the commission of the crimes the prosecutor expressed once again concerning the appellant, "I wish someone had walked in the back door and blown his head off at that point." Later,
"... Okay. He's testified, Mr. Cunningham also testified that that cylinder turns to the left. As you fire the gun, pull the trigger, it turns to the left. I asked him to put the one marked in red  couldn't use a live one  under the *293 hammer and pull the trigger. He did. When he was through pulling it five times, five times, because Darden shot Turman between the eyes; he clicked in the boy's face, that's number two; he fired in the boy's face is number three; he fired in the boy's neck, is number four; and he fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself.
* * * * * *
"... And Mr. Darden saved one. Again, I wish he had used it on himself... ."
In asserting that the appellant had attempted to change his appearance subsequent to the date of the crimes the prosecutor concluded with the remark, "The only thing he hasn't done that I know of is cut his throat."
At this juncture counsel for appellant objected:
"... Your Honor, that's about the fifth time that he has commented he wished someone would shoot this man or that he would kill himself... ."
Upon which the trial court ruled:
"... All right, gentlemen. Proceed with your argument. Objection will be overruled. Go ahead, sir.. ."
In Stewart v. State, 51 So.2d 494 (Fla. 1951), Mr. Justice Terrell cautioned prosecutors to refrain from inflammatory and abusive argument, directing trial judges to restrain and rebuke counsel from engaging in such tactics. The reason for inhibiting such conduct was concisely stated by him in the following terms:
"... Under our system of jurisprudence, prosecuting officers are clothed with quasi judicial powers and it is consonant with the oath they take to conduct a fair and impartial trial. The trial of one charged with crime is the last place to parade prejudicial emotions or exhibit punitive or vindictive exhibitions of temperament... ." (p. 495)
The implication in the remarks by the prosecutor in that case was that if the defendant were not punished by the jury he would go on to commit a more serious and heinous crime. This can be equated with the argument of the prosecutor in the case at bar wherein he implies that unless the defendant is convicted on the first degree murder charge he will be set free "on the public".
Reference by the prosecution on repeated occasions to the defendant's conduct while on furlough directed the jury's attention to matters totally immaterial to the offenses charged, and it can be concluded that the only purpose of such references was to inflame and prejudice the jury in their deliberations upon the charges at issue. In Gluck v. State, 62 So.2d 71 (Fla. 1952), the prosecutor, in the words of Justice Mathews, "hurled epithets at the accused so foul, vile, abusive and obscene as to be unquotable in this opinion". The trial judge refused to caution and admonish the state attorney that such conduct is highly irregular, as urged by the defense. Earlier in the rape prosecution, the prosecutor had referred to the accused's unemployment, family, religion, character, and had introduced detailed evidence respecting an alleged similar act, although the accused's identity and carnal knowledge of the prosecutrix were admitted. This court reversed the conviction and granted a new trial since the prosecution at issue was not "a fair and impartial trial". Rather than a fair commentary upon the evidence or reasonable inferences to be drawn therefrom, the above-quoted remarks by the prosecution in the case at bar can only be characterized as vituperative personal attacks upon the appellant and as appeals to passion and prejudice.
As was stated by this Court in Collins v. State, 180 So.2d 340 (Fla. 1965):
"... The rule is clear against inflammatory and abusive argument  the *294 problem is applying the rule to the particular facts at hand. The history of the legal profession is clear also in its love of florid arguments and dramatic perorations. The line between the inflammatory and the dramatic is not clear..."
Here that line has been crossed. Vigorous and diligent advocacy on the part of the state is not only commendable, but necessary to make our system of jurisprudence work. The strenuous advocacy by each of the parties to a criminal proceeding of the facts and evidence which best establish their respective positions provides the basis upon which the jury may synthesize all such facts and evidence to arrive at that most desired result in our system  the truth. However, appeals to passion and prejudice distort the system and must be condemned if our system is to function and endure.
Appellee asserts that timely objection to inflammatory argument must be made to preserve the point for appellate review. There has heretofore been quoted the objection made by the appellant's counsel to the remarks by the prosecution and the court's ruling thereon. I deem this sufficient to preserve the matter on appeal since it afforded the trial court the opportunity to at least attempt to cure the effects of the remarks. It is not clear at all, however, that it was even within the power of the trial court to disabuse the minds of the jurors of the cumulative effect of the patently inflammatory remarks of the prosecution even had it sustained the objections to the remarks and admonished the jury accordingly. The issue really is, did the appellant receive a fair trial in the atmosphere created by the prosecution's remarks. As pointed out by the court in Wilson v. State, 294 So.2d 327 (Fla. 1974):
"The State points out that in some instances there was an absence of objection in the present trial and in other instances an objection to the improper inferences was sustained. Such absence will not suffice where the comments or repeated references are so prejudicial to the defendant that neither rebuke nor retraction may entirely destroy their influence in attaining a fair trial." (pp. 328-329)
See also Pait v. State, 112 So.2d 380 (Fla. 1959); Oglesby v. State, 156 Fla. 481, 23 So.2d 558 (1945); and Knight v. State, 316 So.2d 576 (Fla.App. 1st 1975). I conclude that the remarks set out herein were such that would unduly create, arouse and inflame the sympathy, prejudice and passions of the jury so as to effectively deprive the appellant of a fair trial. Barnes v. State, 58 So.2d 157 (Fla. 1952).
It is appropriate to comment upon another category of remarks made by the prosecution in final argument. In expressing their personal beliefs concerning the guilt and lack of veracity of the defendant the prosecutors argued:
"... I am convinced, as convinced as I know I am standing before you today, that Willie Jasper Darden is a murderer, that he murdered Mr. Turman, that he robbed Mrs. Turman and that he shot to kill Phillip Arnold. I will be convinced of that the rest of my life... .
* * * * * *
"... I don't know, he said on final argument I wouldn't lie, as God is my witness, as God is my witness, I wouldn't lie. Well, let me tell you something: If I am ever over in that chair over there, facing life or death, life imprisonment or death, I guarantee you I will lie until my teeth fall out.
"What does he have to lose to lie? Nothing. Nothing. The only person who took that stand, Mr. Maloney said no one took that stand and lied under oath. He was wrong. One did. Sitting over there with a yellow shirt on with the stripe down the front at this time... ."
These statements clearly violate the letter and spirit of Section 5.8(b), American Bar *295 Association Standards for Criminal Justice and D.R. 7-106(C)(4), Code of Professional Responsibility. Such argument has been condemned by this Court long before the adoption of the cited Standards and Code. As stated in Tyson v. State, 87 Fla. 392, 100 So. 254 (1924):
"It is generally understood that the expression by counsel in argument before the jury of personal opinion of guilt is not only bad form, but highly improper, as counsel is not a witness, nor under oath to speak the truth, not called as an expert to give his opinion. Adams v. State, 54 Fla. 1, 45 So. 494."
To reiterate the standard of conduct expected of a representative of the State in the prosecution of a criminal trial as heretofore enunciated by several of our district courts of appeal:
"... It is the duty of a prosecuting attorney in a trial to refrain from making improper remarks or committing acts which would or might tend to affect the fairness and impartiality to which the accused is entitled. His duty is not to obtain convictions but seek justice, and he must exercise that responsibility with the circumspection and dignity the occasion calls for. Cases brought on behalf of the State of Florida should be conducted with a dignity worthy of the client... ."

Knight v. State, supra; Cochran v. State, 280 So.2d 42 (Fla.App. 1st 1973); and Kirk v. State, 227 So.2d 40 (Fla. App. 4th 1969).
Yet the majority opinion suggests that this welter of highly prejudicial comment was fair, or if not exactly fair, then at least not so improper as to constitute reversible error "when the totality of the evidence is considered". In other words, any error underlying the conviction of the appellant must have been harmless. When one considers that Darden has been sentenced to die by the court which heard these arguments after recommendation of death by the jury to which they were made, it is evident that any assigned error should be given very careful consideration before the harmless error doctrine is invoked. Obviously, resort to the doctrine in cases of capital punishment should be carefully limited.
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), a California state prosecutor had commented upon defendants' failure to testify and the trial judge had charged the jury that defendants' silence could be used as the basis for adverse inferences. On appeal, the Supreme Court of California held that, while these comments at trial had denied defendants their constitutional rights, such error did not constitute a "miscarriage of justice" and was therefore harmless. The United States Supreme Court reversed the conviction, holding that in order for the denial of a federal constitutional right to be held harmless in a state criminal case, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to a defendant's conviction. The court further held that the burden of proving lack of harm rests on the State. Id. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710.
Surely there is a federal constitutional right to a fair and impartial trial in the courts of this State. U.S.Const. Amends. VI, XIV. Recognizing that no defendant is entitled to a perfect trial, nonetheless, I am not satisfied that Darden's fundamental right to a fair trial was unharmed by the prosecution's improper commentary and believe that under the Chapman test this conviction cannot stand. The Florida cases cited heretofore also lead me to this conclusion.
Accordingly, I would vacate the judgment and sentence of death and remand this cause for a new trial.
ENGLAND, J., concurs.
NOTES
[1] cf. Arline v. State, 303 So.2d 37 (Fla.App. 1974).
[2] Collins v. State, 180 So.2d 340 (Fla. 1965).
[3] Sanders v. State, 241 So.2d 430 (Fla.App. 1970); Hamrick v. State, 235 So.2d 360 (Fla.App. 1970), cert. den. 238 So.2d 421 (Fla.) cert. den. 400 U.S. 994, 91 S.Ct. 466, 27 L.Ed.2d 443.
[4] State v. Jones, 204 So.2d 515 (Fla. 1967).